# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 19-744(RAM)** |
| Plaintiff | * | |
| V. | * | |
| **ALDO PIMENTEL-RAMIREZ** | * | |
| Defendant | * | |

## DEFENDANT ALDO PIMENTEL-RAMIREZ' SENTENCING MEMORANDUM

**TO THE HONORABLE COURT:**

**COMES NOW**, defendant **ALDO PIMENTEL-RAMIREZ**, by and through the undersigned attorney, and very respectfully **ALLEGES** and **PRAYS** as follows:

### I. INTRODUCTION

Defendant Aldo Pimentel Ramírez hereby humbly requests from this Honorable Court a sentence of probation, or in the alternative, a split sentence of 10 months, 5 months in confinement and 5 months in home detention.

### PROCEDURAL HISTORY

1. On November 18, 2019, defendant Pimentel-Ramírez was subject of a three count indictment rendered by a District of Puerto Rico Grand Jury, charging him bulk cash smuggling out of the United States in violation of Title 31, U.S.C., § 5332; International monetary instrument transactions in violation of Title 31, U.S.C., § 5324 and False Statement or Representation Made to a Department or Agency of the United States in violation of Title 18, U.S.C., § 1001.

2. On February 20, 2020, the defendant plead guilty pursuant to a straight plea to all counts of the Indictment.

3. The Sentencing Hearing has been scheduled for May 12, 2020.

4. Pursuant to the Presentence Investigation Report filed on April 23, 2020, the applicable guidelines are the following:

According to the United States Sentencing Guidelines, sentencing table based upon a total offense level of 12 and a criminal history category of I, the guideline imprisonment range is 10 to 16 months. Since the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by (1) a sentence of imprisonment; (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in USSG §5C1.1(e), provided that at least one-half of the minimum term is satisfied by imprisonment. USSG §5C1.1(d). Since the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment. USSG §5C1.1(d). (PSI, parg 86, 87 & 92).

## II.   FACTS

The defendant Aldo Pimentel-Ramírez, an alien with B1/B2 type visa, failed to declare $80,100.00 that he had on two briefcases and in a wine cooler. Defendant Pimentel was traveling back to the Dominican Republic (D.R.) with his brother Regis Pimentel; his brother had one of the suitcases, Pimentel the other, and he also checked the wine cooler. Each handheld suitcase had $20,000.00 and the wine cooler had $60,000.00. The money was air sealed in plastic bags. No effort was made to hide the money, specially in the handheld luggage, and no aftermarket alterations were made to the cooler with the intent of hiding the money (e.g. false bottom or pockets). See Exhibits 1, pictures of bag and cooler.

Defendant Pimentel did not declare the full $100,000.00 on the standard CBP form, but both his brother and himself did declare a total of $19,900.00.

The government has not stated specifically that this money was related to illegal proceeds; it only stated that a dog alerted positive to the smell of controlled substances, something that is obvious as most of the money in circulation has traces of narcotics.

Defendant Pimentel was then submitted to a grueling 3 hour long interrogatory in which agents tried to extract an admission of guilt by making him state that the money was related to narcoticts or other illegal activity, the agents also stated to him that if he confessed and waived the proceeds to the U.S.A. that he would be free to go. His brother (his visa was cancelled) was also quesyioned but was released and ordered to get back to the Dominican Republic as Pimentel assumed ownership and responsibility for the total amount of money.

Defendant Pimentel stated to the federal agents that the money was proceeds from his wine and cigar business; defendant exports cigars from the D.R. to the U.S.A. and imports wine and beverages from P.R. to D.R. During questioning he stated that he did business with Mr. Richard Gonzalves (owner of Bottles Restaurant and a wine distributor located in San Patricio, Guaynabo,

P.R.) and that the money seized was part of several distribution transactions done between them and that he had nothing to hide about it. [1]

No effort was made to conceal the money. The defendant carried with him three (3) bundles of cash: two (2) of the bundles had $20,000.00 each one was carried inside a briefcase by Mr. Pimentel and the other by his brother. If you opened the briefcase's zippers the money would literally stick out in plain view. The $60,000.00 were under some insulation material and wine divider; if you removed the zipper insulation the money could be seen.

### III. THE DOG'S ALERT, TAKEN ALONE, OS MEANING LESS

Allegedly a dog's sniffed alerted and positive to the presence of narcotics in the money. First, this is meaningless as to probable cause to prove that the money was part of a narcotic transaction. The Government's inference may be that because the dog positively alerted then the money must be related to drug business.

The real conclusion that must be drawn from this is that, besides a dog sniff, the Government has no other evidence that the money is tied up to drug trafficking. Ninety seven (97) percent of all bills in circulation in the country are contaminated by cocaine, with an average of 7.3 micrograms of cocaine per bill. Crime and Chemical Analysis, 243 Science 1554, 1555 (1989). Why the nation's currency is so thoroughly corrupted has been a topic of inquiry. It has been estimated that one out of every three circulating bills has been involved in a cocaine transaction. R. Siegel, Intoxication 293 (1989). Cocaine attaches - in a variety of ways - to the bills, which in turn contaminate others as they pass through cash registers, cash drawers, and counting machines

---

[1] [1] The federal agents seized defendant's cellular phone, showing clear business transactions between the defendant and other business entities, including Richard Gonzalvez. One of the conversations sustained with Gonzalvez through WhatsApp shows Pimentel instructing Gonzalvez to deliver $10,000.00 to "Miguel the Trucker", and the balance of money in the possession of Gonzalvez was at that time, (Nov 6, 2019) the amount of $240,000.00. (See Exhibit 2).

at banks and commercial establishments, id.; Crime and Chemical Analysis, supra note 2, at 1555; Tr. I at 28.

Courts have also observed, on the basis of expert testimony (see above paragraph), that as many as one in three circulating bills have been involved in a cocaine transaction. See United States v. $ 639,558, 955 F.2d at 714 n.2. Cocaine and other drugs attach to the oily surface of currency and as each bill passes through cash registers, wallets and counting machines, trace amounts of drugs pass to other bills. See United States v. US Currency, $ 30,060, 39, F.3d 1039, 1042-43 (9th Cir.1994). If, in fact, such a large percentage of bills are contaminated with drugs, then an alert by a drug-sniffing dog that a bundle of bills is contaminated is of limited probative value. See United States v. $12,840 in United States Currency, 510 F. Supp. 2d 167,171-72 (D. Mass. 2007)

The money was sealed in clear plastic. However, money will may be wrapped in too many things, inside of shoes or anything else according to the Government. (See U.S. v. Carlos Efren Reyes-Rosado aka Farruko, criminal no. 18-239(GAG). It is more important the evidence that is lacking than the one that is present. There were no odor concealing devices such as detergents or deodorants that could trick the dog; the clear sealed plastic doea not diminish the dog's smell capacity. There were no carbon films or papers to prevent proper x-ray identification. As stated, no after marked alterations or hidden pockets were added to the luggage to conceal the money (e.g. false floor or compartment); however, money will be always wrapped in something else be it rubber bands, plastic or paper. Once you opened the two-hand luggage you could clearly see the money sticking out from the main compartments. (See exhibit 3 for luggage pictures).

In conclusion, the dog alert is baseless by itself as to the source of the money as almost all currency in circulation, when stacked together will provide a false positive to narcotics. The

defendant made no effort to conceal the money from the TSA x-rays machine or to confuse the dog's sniffing capacity.

## IV.  THE MONEY IS FROM A LEGITIMATE SOURCE, FOR A LEGITIMATE PURPOSE

Defendant has several businesses. In Puerto Rico defendant made business primarily with Mr. Eduardo Garcia[2], his partner in the tobacco business and Richard Gonzalves, owner of Bottles, a restaurant and wine seller. The last stop of defendant prior to his return to the D.R. would usually be Puerto Rico. Here he would buy wine or alcoholic beverages from Gonzalves and the defendant would distribute them in the D.R. After several years of this business; the escrow with Mr. Gonzalves amounted to $250,000.00, a fact acknowledged by Gonzalvez in the WhatsApp conversation. In support of Mr. Pimentel's contention than Gonzalvez was saving the defendant's money in Miguel the trucker. ("Morning buddy!! Can you get just 10,000 to Miguel- the trucker? Mr. Gonzalvez answered: "I'll be there after 12. "Then added "-10", later, at 12.52pm Mr. Pimentel wrote: 150,000= $250,000 amount- 10,000=240,000 curent".  On November 6, 2019 Mr. Pimentel ever instructed Gonzalvez to give $10,000 to a truck chofer, (See WhatsApp text as exhibit 2).

Through Vegas de Sabanera S.R.L. (Sociedad de Responsabilidad Limitada in the D.R.) defendant Pimentel provided tobacco manufacturing and logistics from the D.R. to the U.S. His partner in this venture is Eduardo Garcia. For example, one invoice of September 23, 2019 from Vegas de Sabanera details a purchase of 15,000 units of rolled tobacco for a total of $13,500.00. detailing the net amounts. Numerous emails and bills of sale can be provided to the Court, but for brevity we will give the biggest ones. A few days before defendant, brokering for Intercigar

---

[2] Mr. Garcia testified before this Court at the defendant's second detention hearing and offered more than $500,000 secured by his properties.

Manufacturers made a sale of $2,560.00. Another invoice dated August 29, 2019 from Tabacos Mundial Inc., from Texas, is billing Mr. Pimentel through Vegas de Sabanera (VGS) import duties, fees and customs filling fees for $1,703.20.). If those are the duties, imagine the size of the transaction. An export invoice paid for by a check of $5,776.49 was made by Principle Cigar to Vegas de Sabanera and received by Defendant. (See exhibit 4 for invoices)

Vegas de Sabanera even has export certificates, and airway bills describing its exports together with an invoice for $14,400.00 dated August 13, 2019. (See Exhibit 5).

Mr. Pimetel undoubtedly did business with Bottles Restaurant and the money seized came from the withdrawal of his business share or escrow maintained by Mr. Richard Gonzalves. The irrefutable truth is that the agents knew or should have known that Pimentel and Gonzalevez were doing business together and that Gonzalvez retained an escrow account in the amount close to $240,000.00. This is evident from the text messages exchanged between them in whatsapp, as Mr. Pimentel's phone was seized by the agents and pursuant to a Court order (docket 27) we were able to retrieve those messages and copy them.(See copy of the exchange text messages as Exhibit 2)

The defendant was planning to give the $100,000 seized by customs as a second payment for the purchase of apartment 7-B, condominium D.J. Residence, at Santiago de los Caballeros, D.R. According to the sales contract, entered on October 9, 2019, the defendant owed $119,500 USD. (See sales contract as Exhibit 6).

**V.     THE UNDECLARED AMOUNT OF $80,100.00 IS THE VALUE OF THE FUNDS (USSG § 2B1.1)**

The defendant and his brother jointly declared $19,900[3] and this amount must be subtracted from the $100,000, and used as the basis for the funds value, USSG § 2B1.1. The amount of <u>$19,900.00 must be returned</u> to the defendant at sentencing as he properly declared them. Forfeitures based on violations of the bulk cash smuggling statute are principally directed toward money launderers, drug traffickers and terrorists, as well as their couriers. See USA PATRIOT Act, Pub. L. No. 107-56, § 371(a)(3). <u>United States v. Jose</u>, 499 F.3d 105 (1st Cir., 2007). Precedent under the <u>United States v. Jose</u>, supra orders that forfeiture, the imposition of a fine or seizure should only be for the undeclared amount. Actually, only the undeclared amount should be used for guidelines purposes pursuant to the loss table, USSG § 2B1.1, ($80,100.00).

In <u>United States v. Bajakajian</u>, 524 U. S. 321, 327–328 (1998), the Court found that forfeiture of the entire amount seized under §5332 would be grossly disproportionate to the gravity of Bajakajian's offense. 524 U.S. at 337. The Court's finding was based on several factors, including: (1) the respondent's crime was "failing to report the wholly legal act of transporting his currency"--he owed no customs duties to the government and it was legal for him to possess the currency in cash and to remove it from the United States; (2) his violation was unrelated to any other illegal activities and the currency was the proceeds of legal activity; (3) he did not fit into the class of person for whom the statute was principally designed, i.e., a money launderer, drug trafficker or tax evader; (4) his maximum length of imprisonment was six months and maximum fine was $ 5,000 under the Sentencing Guidelines, which "confirm a minimal level of culpability"; and (5) the harm he caused was minimal in that his failure to report his currency affected only the government and in a relatively minor way in that the government "would have been deprived only

---

[3] The PSI determines that the defendant only declared $10,000, but is clear that Mr. Pimentel in <u>agreement</u> with his brother Regis Pimentel also declared $9,900. The total amount declared to customs on behest by Mr. Pimentel was $19,900.

of the information that $ 357,144 had left the country." (The maximum length of imprisonment has since changed as reenacted by Congress under the applicable Patriot Act and in response to Bajakajian, however the Supreme Law of the Land and its protections to citizens remain under the Eight Amendment).

Considering the analysis of Bajakajian and Jose, the defendant is not the kind of person for which the Law was created. Defendant Pimentel is a businessman with the strong support and vouching of other legitimate businessmen of the community that can reasonably determine the source of the income seized, and as the money is the product of his labor the seizure of the money would be a deprivation of livelihood.

**The Honorable Chief Judge Gustavo A. Gelpí faced a similar situation in the case of <u>US v. Carlos E. Reyes-Rosado</u>, AKA Farruko, criminal no. 18-239(GAG). In this case, Honorable Judge Gelpí sentenced Reyes-Rosado to a term of probation and <u>ordered the return of the full declared amount.</u>**

## VI. GUIDELINES CALCULATIONS

### A. Acceptance of Responsibility

The defendant clearly expressed his repentance for his actions. He did not report the money at the Luis Muñoz Marín Airport in Puerto Rico, in order to avoid reporting the amount in the Dominican Republic, where sometimes authorities allegedly steal part of the money.

### B. Sentencing Guidelines Calculations

| | |
|---|---|
| BOL | 6 |
| Amount of funds involved § 2B1.1 | 6 |
| Bulk Cash Smuggling | 2 |

|  |  |
|---|---|
|  | **14** |
| Acceptance of responsibility | -2 |
| **TOL** | **12** |

With a total Offense Level of 12, the guideline imprisonment range is 10-16 months, Zone C. The Court may impose a **split sentence** in this case and sentence the defendant to 5 months of imprisonment and 5 months on home detention. Of course, the defendant will be immediately deported to the Dominican Republic. Nothing in the guideline prevents the Courts from sentencing an alien to a split sentence. See US v Garcia-Ortiz, 310 F.3d 792 (5th Cir. 2002).

The permissive wording of § 5C1.1(d) allows a district court to award either a full term of imprisonment or a split sentence if the guideline range is in Zone C. Either option is a correct "application of the guidelines." In fact, a district court has virtually complete discretion to impose a split sentence under the guidelines. E.g., United States v. Butler, 297 F.3d 505, 517 (6th Cir. 2002) (holding § 5C1.1(d) gives district court discretion to sentence defendant to full term of imprisonment or "split" term); United States v. Carpenter, 252 F.3d 230, 233 (2d Cir. 2001) (court exercised discretion to impose split sentence); United States v. Perakis, 937 F.2d 110, 112 (3d Cir. 1991) (decision whether to impose split sentence under predecessor guideline is "unquestionably within the court's discretion").

**C.    State Harbor Provision- decrease the offense level to 6 pursuant to USSG § 2S1.3(b)(3)**

The defendant qualifies for a decrease to offense level 6 because the funds were the proceeds of lawful activity and were going to be used for a lawful purpose. Several documents attest that Mr. Pimentel was a bonafide businessman with alcohol, beverages and tobacco. Some of the profits for his business were kept in escrow in a fund with Mr. Richard Gonzalvez, owner of The Bottle's Restaurant located in San Patricio, Puerto Rico. The $100,000.00 seized by the government at the airport were given by Mr. Gonzalvez to Mr. Pimentel and some of the money was sealed in plastic bags at the restaurant. The money was going to be used for a down payment for an apartment purchase in the Dominican Republic. (See sales contract as Exhibit 6)

The night before the defendant's arrest, on November 12, 2019, the defendant's brother, Regis Pimentel Ramírez accompanied defendant Aldo Pimentel to the Bottles Restaurant for dinner and saw his brother Aldo going to Gonzalvez' office. Aldo Pimentel later told him that he had obtained money from Gonzalvez. (See copy of Bottles receipt, dated November 12, 2019, and a photo taken by Regis Pimentel as Exhibit 7).

The Commission promulgated this provision as subsection (b)(2), effective November 1, 1993, and redesignated it as subsection (b)(3), effective November 1, 2002. Subsection (b)(3) calls for a reduction in the offense level six if four conditions are met. The four conditions are (1) subsection (a)(2) applies and subsections (b)(1) and (b)(2) do not apply, (2) the defendant did not act with "reckless disregard of the source of the funds," (3) the funds were the proceeds of lawful activity, and (4) the funds were to be used for a lawful purpose.

The safe harbor provision essentially permits the district court to disregard the value of the funds involved in the offense and return the offense level to 6 when specified circumstances exist. In order for Pimentel to benefit from the safe harbor provision, he is required to prove that he did not act with reckless disregard of the source of the funds in his possesion, that the funds were the proceeds of lawful activity, and that the funds were to be used for a lawful purpose.

Also provided for in § 2S1.3 is subsection (b)(3), the so-called "safe harbor" provision, which states the following:

If (A) subsection (a)(2) applies and subsections (b)(1) and (b)(2) do not apply; (B) the defendant did not act with reckless disregard of the source of the funds; (C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to level 6. United States v. Keleta, 552 F3d 861 (D.C. Cir. 2009).

Once again, the $100,000 was destined by Mr. Pimentel to be placed as a down payment for the purchase of an apartment in Dominican Republic, a clear lawful purpose.

C.   **Employment History**

| Start Date | End Date | Employer Name/ Unemployed | Address | Monthly Income | Time in Status/ Hours a Week |
|---|---|---|---|---|---|
| | | | | | |

| 2013 | Present | Vegas de Sabanera, SRL Business Owner | Freesome La Palma, Tamboril Santiago, Dominican Republic | $15,000.00 | (6) years Full Time |
|------|---------|------|------|------|------|
| 1998 | 2003 | Banco Leon Business Manager | Santiago, Dominican Republic | $4,000.00 | (5) years Full Time |

Financial Resources:

Assets, Liabilities, Monthly Income and Expenses:

| Assets | Amount | Liabilities | Amount |
|--------|--------|-------------|--------|
| Jewerly | $5,000.00 | Business | $20,000.00 |
| Personal Savings Account | $14,000.00 | Credit Card | $2,000.00 |
| Personal Checking Account | $36,000.00 | Vehicle | $10,000.00 |
| Business | $60,000.00 | Mortgage | $200,000.00 |
| **Total** | **$115,000.00** | **Total** | **$232,000.00** |
| **Estimated Net Worth: ($117,000)** | | | |

| Monthly Income | Amount | Expenses | Amount |
|----------------|--------|----------|--------|
| Salary | $15,000.00 | Telephone | $100.00 |
| | | Groceries and Supplies | $300.00 |
| **Total** | **$15,000.00** | **Total** | **$400.00** |
| **Estimated Monthly Cash Flow: ($14,600)** | | | |

The defendant has his personal and business accounts combined. Also, he has an account in TD Bank in New York and Banco Popular Dominicano in Dominican Republic. The defendant's consensual partner monthly income is approximately $5,000 USD.

### E. The Court may consider a Variance

The Court may consider a variance and downward departure given the defendant's personal characteristics. Defendant has no past conduct history relating to drug or alcohol abuse, criminal history, and has yielded negative to the urine analysis test. Defendant has no previous arrest or conviction. At the time of the current offense or arrest, the defendant was not on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

He is a young entrepreneur, bonafide businessman, deportable alien, a productive individual, well educated background, the funds were not related to any criminal activity and he had plans to purchase a property in Dominican Republic with the seized moneis.

**WHEREFORE**, it is respectfully requested from this Honorable Court to take notice of the information provided herein and sentence defendant Pimentel-Ramirez to probation, time served, or in the alternative, a split sentence of 10 months, with half of this amount in home detention and to be immediately deported to Dominican Republic.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 5th day of May 2020.

**S/LUIS RAFAEL RIVERA**
**LUIS RAFAEL RIVERA**
**USDC-PR 129411**
**LUIS RAFAEL RIVERA LAW OFFICES**
CAPITAL CENTER BLDG.
SUITE 401
239 ARTERIAL HOSTOS AVENUE
SAN JUAN, PUERTO RICO 00918
PHONE: (787) 763-1780
FAX: (787) 763-2145
E-MAIL: luiswichyrivera@hotmail.com

**I HEREBY CERTIFY**: That I on this same date electronically filed the foregoing document with the Clerk of Court for the District of Puerto Rico, through the CM/ECF electronic

filing system, which will provide notification of this filing to the United States Attorney's Office for the District of Puerto Rico.

        **S/LUIS RAFAEL RIVERA**
        **LUIS RAFAEL RIVERA**
        **USDC-PR 129411**
        **LUIS RAFAEL RIVERA LAW OFFICE**